762 F.2d 1009
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
KATHLEEN KOSAL, PLAINTIFF-APPELLANT,
v.
SHELL OIL COMPANY, DEFENDANT-APPELLEE.
 NO. 84-1330
 United States Court of Appeals, Sixth Circuit.
 4/19/85
 
 On Appeal from the United States District Court for the Eastern District of Michigan
 Before: ENGEL, MARTIN and KRUPANSKY, Circuit Judges.
 PER CURIAM.
 
 
 1
 Kathleen Kosal appeals the decision of the United States District Court for the Eastern District of Michigan granting summary judgment for the defendant, Shell Oil Company, on Kosalls claim of improper interference with prospective contractual relations.[1]
 
 
 2
 Upon the death of her husband on August 20, 1978, the plaintiff, Kathleen Kosal, acquired the ownership interest in a gasoline station located in Detroit, Michigan. Kosal's husband, Robert, had leased the station to Sallie L. Nance and Charles Blanton, who had entered into a dealer agreement with Shell Oil Company. Under the dealer agreement, which was in effect until April 30, 1982, Nance and Blanton were allowed to use Shell's equipment, including eight underground gasoline storage tanks. The agreement also provided:
 
 
 3
 18. OWNERSHIP AND REMOVAL BY SHELL. All of the equipment shall remain Shell's personal property, notwithstanding any attachment thereof to the premises; and Shell may enter the premises and remove therefrom all or any part of the equipment within 60 days after any termination of this Contract . . ..
 
 
 4
 As owner of the station, Robert had signed the agreement, acknowledging
 
 
 5
 Shell's ownership of such equipment, right to remove the same from the premises, and right to enter the premises for the purpose of inspecting, repairing, painting or removing the equipment, all as provided in the Contract . . ..
 
 
 6
 After her husband's death Mrs. Kosal transferred her interest in the station to Kosal's Historical Station, Inc., a corporation which she wholly owned.
 
 
 7
 Between 1978 and 1981 the condition and appearance of the service station deteriorated substantially. Shell had appearance standards for its stations and periodically sent letters to dealers, but not owners, stating the items needing improvement. On 18 different occasions between September, 1978, and May, 1981, Shell sent the dealer at Kosal's station a list of problems that needed to be cured. Although Kosal requested a statement of appearance problems at the station in December, 1979, Shell did not respond. Nevertheless, Kosal was made fully aware of the problems at the station through conversations with Shell representatives, the dealer at the station, and neighbors who complained to her.
 
 
 8
 In May 1981, Kosal began negotiating with Thomas Yono about a possible sale of the station. In various telephone conversations she had had with Marathon Oil Company, Gulf Oil Corporation and Mobil Oil Corporation, each had indicated a willingness to sell gasoline to anyone who would continue operating the station. When Kosal met with Yono, she told him that the station needed to be fixed up but that Shell was not being very cooperative. However, she indicated that Mobil or Marathon would be willing to loan money to help a new dealer fix up the station. She also told Yono that Shell had promised her that a purchaser would be able to buy the Shell equipment installed at the station. Kosal and Yono tentatively agreed on a price of $350,000, but Yono said that he would have to wait until he sold a piece of property to have enough money for a downpayment.
 
 
 9
 In the meantime Shell decided that the underground storage tanks at the station needed to be replaced since several of them were leaking. Although the tanks could have been repaired by applying an inside coating of fiberglass, Shell preferred replacement because new tanks would last much longer than repaired tanks. The cost of replacing the tanks was estimated at $50,000.
 
 
 10
 Yono, who wanted very much to be a Shell dealer, lost interest in purchasing the station when Shell's sales manager informed him that Shell would not grant a new dealership to anyone unless new underground tanks were installed.
 
 
 11
 In the meantime, Kosal had explored other possibilities for selling the station. In December 1981, she discussed with Shell officials a possible option agreement under which Shell would take an option to purchase the station for $100,000. Kosal initially refused, believing the price to be too low, but in January, 1982 agreed to the option contract with Shell at that price. Shell's real estate representative told Kosal that a real estate survey, traffic count, independent appraisal and home office approval were required before Shell would decide whether to purchase the station. He explained that Shell would take three months to make up its mind. Because Kosal knew that Shell might not purchase the station, she continued to seek other potential purchasers. On April 7, 1982, Shell told Kosal that it would not exercise its option.
 
 
 12
 On April 27, 1982, Frank Ahmed offered to purchase the station for $75,000. Kosal then contacted Shell's real estate representative to tell him about the offer. He told Kosal that despite the offer Shell was going to come in the next day to dig up its underground storage tanks, as it was permitted to do under the terms of its dealer agreement. Upon hearing this news, Ahmed withdrew his offer. On April 29 and 30, 1982, when the dealer agreement with Nance and Blanton expired, Shell removed its underground tanks from the station.
 
 
 13
 Kosal later sold the station to Sheraton Court Associates for $61,400.
 
 
 14
 Kosal brought suit against Shell, alleging intentional interference with prospective contractual relations. Finding that the facts alleged by Kosal failed to establish her claim as a matter of Michigan law, the district court granted summary judgment for Shell. Specifically, the court found that Kosal had not shown that Shell did anything 'illegal, unethical, or fraudulent' so as to establish her claim under Michigan law.
 
 
 15
 Upon consideration, we believe that the district court did not err in interpretating Michigan law to require 'illegal, unethical, or fraudulent' conduct in order to establish tortious interference with prospective contractual relations. See Meyering v. Russell, 393 Mich. 770, 224 N.W.2d 280 (1974); Weitting v. McFeeters, 104 Mich. App. 188, 304 N.W.2d 525 (1981). Appellant's argument that the jury should have been left to decide whether Shell's conduct was in some other manner 'improper' is without merit, particularly when the conduct challenged was fully within the rights that Shell had reserved to itself by contract.
 
 
 16
 The judgment is, therefore, AFFIRMED.
 
 
 
 [1]
 Kosal did not appeal the summary judgment for the defendant on her claim under the Petroleum Marketing Practices Act, 15 U.S.C. Sec. 2801 et seq